# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| BENJAMIN C. CRIPPS | CASE NO. 3:19-CV-1501 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| ANDREW SAUL, COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION | MAG. JUDGE KAREN L. HAYES |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Benjamin Cripps filed the instant application for Title II disability insurance benefits on August 23, 2018. (Tr. 11, 130-133). He alleged disability as of October 1, 2017, because of post-traumatic stress disorder ("PTSD"), depression, anxiety, and trouble sleeping. (Tr. 159). The state agency denied the claim at the initial stage of the administrative process. (Tr. 69-88). Thereafter, Cripps requested, and received a March 8, 2019, hearing before an Administrative Law Judge ("ALJ"). (Tr. 31-68). However, in a June 20, 2019, written decision, the ALJ determined that Cripps was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to other work that exists in significant numbers in the national economy. (Tr. 8-27). Cripps appealed the adverse decision to the Appeals Council. On September 27, 2019, however, the Appeals Council denied Cripps' request for review; thus, the ALJ's decision became the final decision of the Commissioner.

(Tr. 1-3).

On November 22, 2019, Cripps sought review before this court, and asserted four assignments of error:

1)      Plaintiff did not knowingly and intelligently waive his right to counsel and was prejudiced thereby;

2)      The ALJ's finding that substance abuse is a contributing factor, material to a finding of disability, is not supported by substantial evidence;

3)      The ALJ's conclusory reason for declining to assign any weight to the VA finding of disability transgressed controlling Fifth Circuit law; and

4)      The ALJ failed to properly consider plaintiff's subjective complaints.

Following the submission of memoranda, the matter is now before the court.

## **Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of

2

the Commissioner.   *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.   *See* 42 U.S.C. § 423(a)(1)(D).   The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ."   42 U.S.C. § 423(d)(1)(A).   Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.   *See* 42 U.S.C. § 423(d)(2)(A).   Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.   *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.   *See* 20 C.F.R. §§ 404.1520, 416.920.   The steps are as follows,

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)    If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

3

(5)    If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.   *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).   When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.   *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).   If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.   *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## ALJ's Findings

### I.    Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity since the alleged disability onset date.   (Tr. 13).   At step two, she found that the claimant suffers from severe impairments of PTSD, alcohol use disorder, alcohol-induced mood disorder, and anxiety disorder.   (Tr. 14).[1]   She concluded, however, that the impairments, even with the substance abuse, were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.   (Tr. 14-16, 20-22).

### II.    Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity

---

[1]  She determined, however, that the claimant's hypertension was non-severe.   *Id*.   She further found that his problems with his right elbow, right knee, right shoulder, swelling, and with his motor skills were not medically determinable impairments.   *Id*.

("RFC") to perform a full range of work at all exertional levels, except that he would need at least two extra breaks during the workday (each of fifteen-minute duration).  (Tr. 16-19).  He also would be absent at least two days per month and would be off task at least twenty percent of the workday.  *Id*.

The ALJ further found, however, that, *if* the claimant ceased his substance abuse, then he still would have an RFC to perform the full range of work at all exertional levels, but his remaining mental impairments only would restrict him to simple, routine, repetitive work, simple work-related decisions, occasional interaction with supervisors and coworkers, and no more than incidental contact with the public, such that he would be working primarily with things, rather than people.  (Tr. 22-26).

### III.    Steps Four and Five

At step four, the ALJ determined that the claimant was unable to perform any past relevant work, regardless of his substance abuse.  *See* Tr. 19, 26.  Accordingly, she proceeded to step five.  At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education, and the ability to communicate in English.  *Id*.  Transferability of job skills was not material to the determination of disability.  (Tr. 26).

The ALJ then observed that given the claimant's vocational factors, and if he had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. § 404.1569; Rule 204.00, Appendix 2, Subpart P, Regulations No. 4; Tr. 20.  However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent the additional limitations eroded the occupational base for work at all exertional levels. *Id*.

In response to a hypothetical that included the effects of the claimant's substance abuse

5

disorder, the VE opined that there were no jobs in the national economy that the claimant could perform. (Tr. 20, 62-63). In other words, if the claimant's substance abuse were considered, a finding of "disabled" would be appropriate. *Id.*

However, if the claimant *stopped* substance abuse and his RFC did *not* include limitations related to substance abuse, then the VE was able to identify representative jobs of housekeeper, *Dictionary of Occupational Titles* ("DOT") Code # 323.687-014; document specialist, DOT # 249.587-018; and kitchen helper, 318.687-010, that were consistent with this RFC and the claimant's vocational profile. (Tr. 26, 61).[2]

Accordingly, the ALJ concluded that the claimant's substance abuse disorder was a contributing factor material to the determination of disability because the claimant was not disabled if he ceased substance abuse. (Tr. 27). As such, a finding of not disabled necessarily followed. *Id.*

### Non-Exhaustive Chronology of Relevant Medical Evidence

On January 16, 2017, Cripps went to the emergency room with complaints of abnormal speech, left arm weakness and bilateral lower extremity weakness. (Tr. 322-330). However, he left the facility against medical advice. *Id.*

On January 20, 2017, Cripps returned to the emergency room for further evaluation following problems with his spouse. (Tr. 314-321). EMS stated that he possibly had taken a handful of an unknown substance. *Id.* EMS further related that plaintiff had explained that his wife was threatening to leave him and he just wanted some attention. *Id.* He used alcohol daily

---

[2] The VE responded that for the housekeeper, document specialist, and kitchen helper jobs, there were 136,000, 73,000, and 277,000 positions, respectively, available nationally. (Tr. 61). This incidence of work constitutes a significant number of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

– heavily.  *Id.*  Plaintiff had been fighting with his fiancée and he had a shotgun in the front seat of his car while drinking heavily.  *Id.*  He was diagnosed with suicide gesture and intentional drug overdose and hospitalized from January 20-23, 2017.  (Tr. 439-440, 563-564).  Upon discharge, he was diagnosed with anxiety disorder and PTSD, and assigned a Global Assessment of Functioning score ("GAF") of 65.[3]  *Id.*

On June 20, 2017, plaintiff was seen by psychologist Marceline Brown for a psychology consultation.  (Tr. 379-383).  He reported that he drank about a case of beer per week.  *Id.*  In 2015, he drank a case of beer per day, plus a pint of vodka.  *Id.*  He was diagnosed with PTSD, anxiety, and depression.  *Id.*  At that time, he did not have service-connected PTSD or other disability.  *Id.*

Plaintiff again was hospitalized for ETOH from July 10-11, 2017.  (Tr. 559).

On July 20, 2017, Cripps was diagnosed with gouty tophus of the right elbow.  (Tr. 378-379).

Plaintiff next was hospitalized from September 5-7, 2017, for alcohol dependency, gastritis, and alcoholic hepatitis.  (Tr. 418-419, 558).  However, he self-discharged against medical advice.  (Tr. 434-435).

On October 21, 2017, a treatment note documented that plaintiff had started drinking again in response to stress in his relationships.  (Tr. 371).

---

[3]  "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'"  *Boyd*, 239 F.3d at 701 n2 (citing American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 1994) (DSM-IV)). A GAF of 61-70 indicates "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**."  DSM-IV, pg. 32.

On October 23, 2017, plaintiff had an orthopedic surgery consultation for his gouty right elbow.  (Tr. 369).  He had failed to keep his post-operative appointments and was admitted with swollen and painful right elbow with purulent drainage.  *Id.*  Nonetheless, his right elbow had an almost full range of motion.  *Id.*

On October 27, 2017, plaintiff had an open, draining wound on his right elbow.  (Tr. 362-363).

On November 29, 2017, Cripps went to the hospital for complaints of a headache, but denied back or neck pain.  (Tr. 305-313).  His blood alcohol level was in the 300s.  *Id.*  He admitted that he had been drinking since junior high school.  *Id.*  It was noted that he could have some sort of encephalopathy secondary to alcohol abuse.  *Id.*  He was instructed to follow-up with a neurologist if his symptoms worsened.  *Id.*

Records from Rapides Medical Center indicate that on May 26, 2018, plaintiff's wife found him impaired at home.  (Tr. 266-269).  Plaintiff allegedly told his wife that he wanted to commit suicide.  *Id.*  He admitted to taking 10-20 tables of clonazepam.  *Id.*[4]  He reported that he drank three 24-ounce beers the day before, and his blood alcohol content on admission was 366.  *Id.*  Plaintiff later changed his story and said that he took three to four tablets in an effort to sleep.  *Id.*  He explained that he mixed alcohol and clonazepam because he wanted to get a good night's sleep.  *Id.*  He denied depression and anhedonia.  *Id.* Cripps's current wife stated that his ex-wife was trying to take custody of his children.  *Id.*  Plaintiff reported no problems with appetite or energy level.  *Id.*  Concentration, however, always was problematic.  *Id.*  He

---

[4] Plaintiff admitted to suicidal intent.  (Tr. 295-313).  He further acknowledged drinking alcohol and taking approximately 25 pills that morning.  *Id.*  Plaintiff stated that he drank daily and requested a beer so he would not have withdrawal symptoms.  *Id.*

reported elevated anxiety and two to three panic attacks per month.  *Id.*  He also stated that he experienced occasional intrusive memories and nightmares about twice per month.  *Id.* Plaintiff had received outpatient substance abuse treatment in late 2017.  *Id.*  However, he had no history of acute inpatient psychiatric admission.  *Id.*  His primary care physician had prescribed clonazepam for PTSD.  *Id.*  He had no prior suicide attempts.  *Id.*  At that time, he drank two to three 24-ounce cans of beer, two to three times per week.  *Id.*  He reported occasional attendance at AA meetings.  *Id.*  Plaintiff further claimed that he had been disabled since September 2017.  *Id.*  He presented as an acute risk of harm to himself outside of the hospital.  *Id.*  He was diagnosed with PTSD, alcohol use disorder, and to rule/out major depressive disorder.  *Id.*  He met the criteria for involuntary commitment.  *Id.*

On May 30, 2018, Cripps was transferred to the VA psychiatric center, where he was hospitalized until June 8, 2018, because of alcohol-induced mood disorder, alcohol use disorder, and PTSD.  (Tr. 331-333, 550).  He reported bilateral knee pain.  (Tr. 388).  Upon admission, Cripps underwent a psychiatric evaluation with Cyntrell Crawford, M.D.  (Tr. 608-611).  His chief complaint was that he was stressed.  *Id.*  He minimized his alcohol use and reportedly had fallen off the wagon after four months of abstinence.  *Id.*  He had gotten in an argument with his wife and thought he would just go to sleep, with the assistance of 25 klonopin.  *Id.*  He admitted to depressive symptoms two-three days per week for the past year.  *Id.*  He reported worsening anxiety, irritability, difficulty controlling his anger, and insomnia.  *Id.*  He denied past inpatient or outpatient psychiatric history.  *Id.*  Plaintiff also denied any past suicidal

attempts.  *Id.*  Dr. Crawford diagnosed alcohol induced mood disorder, alcohol use disorder, and PTSD by history.  *Id.*  She assigned Cripps a GAF of 45.  *Id.*[5]

Plaintiff attended substance abuse disorder day sessions in August 2018, where he was flagged as a high risk for suicide, with a history of alcohol abuse/dependence.  (Tr. 350-354).  *Id.*  He reported improvements in his hygiene and shaved every morning.  *Id.*  However, he reported worsening dreams and acting out in his sleep.  *Id.*  He stayed busy doing chores around the house and planned to start going to the gym at Camp Beauregard.  *Id.*  He also wanted to raise rabbits for meat.  *Id.*  Plaintiff's chief complaint was ETOH for the past 20 years.  (Tr. 355).  His last arrest was a domestic charge in 2017.  *Id.*  Crips reported his pain as a four on a ten-point scale. (Tr. 356).

On, or about August 14, 2018, Sherri Transier, Ph.D., diagnosed plaintiff with severe alcohol use disorder.  (Tr. 361).  Also, on August 14, 2018, rehabilitation technician Wayne Coleman noted that plaintiff had a long history of ETOH abuse with multiple prior treatment episodes.  (Tr. 366-367).  Plaintiff would fail to follow-up completion of treatment and return to active use.  *Id.*  He completed the Biloxi SUDS program in May 2018, and then resumed drinking three weeks later.  *Id.*

On September 4, 2018, plaintiff relapsed after almost 30 days of sobriety.  (Tr. 501-502).

On September 14, 2018, plaintiff was brought to the emergency room to be medically cleared because he had been arrested for failure to pay child support.  (Tr. 286-294).  Cripps admitted to drinking seven to eight beers the night before and being hungover."  *Id.*  He denied

---

[5]  A GAF of 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition DSM-IV, p. 32.

back pain, extremity pain, and neck pain.  *Id.*  Plaintiff reported depression/mood disorder (PTSD, anxiety), GERD/gastritis, and hypertension.  *Id.*  He reported prior surgeries to right shoulder, right elbow, and right knee.  *Id.*  Cripps was diagnosed with substance abuse and tachycardia.  *Id.*

At the request of the state agency, plaintiff underwent an October 27, 2018, mental status examination with Fay Thrasher, Ph.D.  (Tr. 546-549).  Cripps drove himself to the interview and was neatly and appropriately dressed.  *Id.*  Cripps informed Thrasher that he was 100 percent unemployable.  *Id.*  He explained that he had nightmares, flashbacks, trust issues, and was on guard all of the time.  *Id.*  He did not socialize and remained at home.  *Id.*  He stated that he had violent tendencies and was easily agitated.  *Id.*  He became anxious when he was around a lot of people.  *Id.*  He reported that he had been clean for two months.  *Id.*  Cripps stated he suffered from gout, high blood pressure, acid reflux, high cholesterol, knee, back, and shoulder pain.  *Id.*  His knee and back pain limited his ability to stand, sit, lift, and walk.  *Id.*  He bathed, groomed, and dressed himself without assistance.  *Id.*  He was polite and cooperative during the interview.  *Id.*  However, he did not relate well to others on a one-to-one basis because he was easily agitated.  *Id.*  He functioned independently and displayed age appropriate behaviors.  *Id.*  His thinking was organized and goal-directed.  *Id.*  Plaintiff's mood appeared depressed, and he slept poorly because of nightmares and racing thoughts.  *Id.*  He felt anxious, depressed, fearful, and angry.  *Id.*  He acknowledged one prior suicide attempt in May 2018.  *Id.*

Dr. Thrasher estimated that Cripps's intellectual functioning was in the average range.  *Id.*  Also, his concentration, pace, and persistence were good.  *Id.*  He could perform repetitive skills.  *Id.*  His insight appeared to be fairly good, and his judgment was good.  *Id.*  Thrasher

diagnosed PTSD (present and by history); alcohol abuse (present); and psychosocial stressors, with a severity level of four. *Id.* Thrasher opined that plaintiff's prognosis was poor. *Id.* She further opined that plaintiff appeared to be able to fully understand, moderately retain, and fully follow simple instructions within normal limits. *Id.* He also appeared able to perform simple to complex work tasks, but would not be able to maintain attention and concentration to perform these tasks for a two-hour work block. *Id.* His ability to relate to coworkers and the general public also was limited because of his PTSD, medical problems, and high anxiety. *Id.* His ability to sustain effort and persist at a normal pace over the course of a routine 40-hour workweek was diminished due to the aforementioned symptoms, as was his ability to tolerate stress, pressure, and the social environment of a work setting. *Id.*

On October 31, 2018, non-examining agency psychologist James Pinkston, Ph.D., reviewed the record and completed a psychiatric review technique, in which he indicated that plaintiff suffered from a trauma and stressor-related disorder, plus substance abuse addiction disorder (alcohol). (Tr. 74-76). He opined, however, that plaintiff's impairments did not meet or equal a listing. *Id*.

Dr. Pinkston also completed a mental residual functional capacity assessment. (Tr. 76-80). He found that Cripps had no understanding and memory limitations. *Id*. However, he was "moderately" limited in his ability to perform activities within a schedule, maintain regular attendance, and to be punctual. *Id*. Cripps also was "moderately" limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id*. Pinkston explained that "file evidence" reflected that Cripps could sustain attention for up to two-hour blocks of time when performing simple and routine work-related

12

tasks, follow simple work-like procedures, and to make simple work-related decisions.  *Id*. Pinkston further opined that Cripps was "moderately" limited in his ability to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors.  *Id*.  Pinkston explained that Cripps would have "significant difficulty dealing effectively with demands of the general public, but could relate to public on a limited basis, and coworkers and supervisors in non-confrontational situations."  *Id*.  He also was limited to "respectful supervision and constructive criticism," and could independently maintain appropriate hygiene and dress.  *Id*.  Finally, Pinkston explained that Cripps was "moderately limited" in his ability to respond appropriately to changes in the work setting.  *Id*. As such, Cripps would function best in a standardized work environment with minimal variation. *Id*.

On November 2, 2018, non-examining agency physician Emily Eisenhauer, M.D., reviewed the record, noted that plaintiff had no physical allegations, and opined that Cripps had no physical medically determinable impairments.  (Tr. 74).

On February 13, 2019, plaintiff underwent a neuropsychological consultation and testing with neuropsychologist Patricia Joyce to determine whether he suffered from early onset dementia, and to differentiate the sub-type, if appropriate.  (Tr. 568-576).  Cripps reported that something happened to him in the beginning of January when he collapsed while talking to his wife.  *Id.*  His wife stated that he was having lapses in which he forgot whole conversations. *Id.*  Plaintiff stated that he lost things all of the time and would forget what he was doing.  *Id.* Plaintiff had right rotator cuff surgery in 2002-2003.  *Id.*  He also had right knee surgery in 2013 to re-attach a ligament after he chipped or fractured a knee cap.  *Id.*  Plaintiff currently was in treatment in the SUDS unit for his alcohol abuse.  *Id.*  He continued to report PTSD

symptoms.  *Id.*    Sometimes he slept for six to eight hours, while at other times, he only received

one to two hours of sleep.  *Id.*    He reported that he was "perpetually drunk" for most of his

adult life until this January.  *Id.*    He typically drank six to twelve beers every day and

sometimes shots, also.  *Id.*    He only drank once since January, plus the night before when had

about ten beers because he was anxious about the interview.  *Id.*    He had tried marijuana, but

did not use it regularly.  *Id.*    He was independent with his activities of daily living and was able

to drive.  *Id.*    He indicated that he could no longer work because his job was physical in nature.

*Id.*    He continued to experience symptoms of PTSD.  *Id.*    Joyce administered a battery of

psychological tests and estimated that plaintiff's intellectual functioning was at least in the

average range.  *Id.*    His motor skills were affected such that there was a greater difficulty

associated with the right hemisphere.  *Id.*    His attention skills were low average on some

measures.  *Id.*    His pattern of results was not consistent with dementia.  *Id.*    Chronic alcohol

use tended to lead to reduced functioning in the right hemisphere.  *Id.*    However, PTSD also

can affect speed of processing and attention.  *Id.*    His lapses appeared to warrant further

investigation.  *Id.*    Joyce diagnosed unspecified neurocognitive disorder; PTSD, chronic;

alcohol abuse, uncomplicated; and insomnia disorder.  *Id.*

On February 22, 2019, Dr. Joyce again diagnosed plaintiff with an unspecified

neurocognitive disorder.  (Tr. 566-567).   She recommended that he undergo an MRI and EEG.

*Id.*

On March 1, 2019, Sherri Transier, Ph.D., completed a VA PTSD disability benefits

questionnaire.  (Tr. 650-655).   She indicated that plaintiff suffered from chronic PTSD, and

alcohol dependence, in early remission.  *Id.*    She further stated that Cripps's current symptoms

were attributable to PTSD.  *Id.*    She indicated that he suffered from occupational and social

impairment with deficiencies in most areas such as work, school, family relations, judgment, thinking and/or mood.  *Id.*  She reiterated that one-hundred percent of his current symptoms were attributable to PTSD.  *Id.*  She noted that plaintiff had markedly diminished interest or participation in significant activities.  *Id.*  He also suffered irritability or outbursts of anger, difficulty concentrating, hypervigilance, and exaggerated startle response.  *Id.*  The PTSD symptoms caused clinically significant distress or impairment in social, occupational, or other important areas of functioning.  *Id.*  He experienced depressed mood, anxiety, chronic sleep impairment, disturbances of motivation and mood, difficulty in establishing and maintaining affective work and social relationships, difficulty adapting to stressful circumstances, including work or a work-like setting.  *Id*.

## Analysis

## I.    RFC

Under the Social Security Act, an individual will not be considered disabled for purposes of disability insurance benefits if alcoholism or drug addiction was a contributing factor material to the Commissioner's determination that the individual is disabled.   42 U.S.C. § 423(d)(2)(C). Thus, the Commissioner follows the following process when there is medical evidence of drug addiction or alcoholism:

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
> > (i)    If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

> (ii)    If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535.

The Commissioner follows the usual case development rules and procedures for any impairment in cases in which drug addiction and alcoholism ("DAA") is or may be an issue.

*Social Security Ruling, SSR 13-2p.; Titles II and XVI: Evaluating Cases Involving Drug Addiction and Alcoholism (DAA)* ("SSR 13-2p").   However, the Commissioner recognizes that,

> a.   Many people with DAA have co-occurring mental disorders; that is, a mental disorder(s) diagnosed by an acceptable medical source in addition to their DAA. We do not know of any research data that we can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol.
>
> b.   **To support a finding that DAA is material, we must have evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA.** Unlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder.

*Id*. (emphasis added).

Ultimately, the Commissioner "will find that DAA is not material to the determination of disability and allow the claim if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA."   *Id*.   In other words, if the evidence in the case record does not demonstrate the separate effects of the treatment for DAA and for the co-occurring mental disorder(s), the Commissioner will find that DAA is not material and allow the claim.   *Id*. Although social security rulings are not binding on the federal courts, *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), they are "binding on all components of the Social Security Administration."   20 C.F.R. § 402.35(b)(1).

Plaintiff contends that the ALJ's finding that DAA was material to a finding of disability

is not supported by substantial evidence.[6]   Key to the ALJ's DAA materiality finding was her

two mental RFCs:   one that included the effects of plaintiff's substance abuse, and one that did

not.   *Id.*   In deriving these RFCs, the ALJ purported to rely, at least in part, on the medical

opinion evidence.   In so doing, however, it appears that she made certain interpretations and/or

findings that are not supported by the record.

For instance, Dr. Thrasher opined that the "claimant appears able to perform *simple to*

*complex work tasks*; however, he would not be able to maintain attention and concentration to

perform *these tasks* for a 2-hour work block."   (Tr. 549) (emphasis added).   In addition,

Thrasher did not distinguish between periods of alcohol use and abstinence.   *Id*.   Nonetheless,

the ALJ assigned "partially persuasive" weight to Thrasher's opinion, and then proceeded to

determine that the "limitation in the ability to maintain attention and persist for two-hour blocks

of time, or for forty-hour workweeks is *not limited for simple work*, though it may be for more

complex tasks; *assuming abstinence from alcohol*.   However, with alcohol, the claimant's

limitations are much more significant."   (Tr. 18) (emphasis added).

It goes without saying that "the ALJ is free to reject the opinion of any physician when

the evidence supports a contrary conclusion."   *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th

Cir.1995) (citation omitted).   However, an ALJ cannot reject a medical opinion without an

explanation supported by good cause.   *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000)

(citations omitted).

Here, the court does not discern where the ALJ provided good cause for discounting Dr.

Thrasher's opinion.   Instead, the ALJ purported to assign "persuasive" weight to the opinion of

the non-examining agency psychologist, Dr. Pinkston, because – according to the ALJ – it

pertained to the claimant's functional limitations *without* alcohol abuse.   (Tr. 18).   Like Dr.

---

[6] Because this issue proves dispositive, the court will address it first.

Thrasher, however, Dr. Pinkston's assessment did not distinguish between plaintiff's DAA and his other mental impairment(s).   (Tr. 78-80).   In fact, the disability examiner plainly stated that no determination was made as to the issue of DAA materiality.   (Tr. 81-82).

Furthermore, insofar as the ALJ attempted to rely on the impression of the non-examining agency psychologist, Dr. Pinkston, in lieu of the findings of the consultative psychologist, Dr. Thrasher, it is manifest that an opinion from a non-examining provider does not provide good cause for an ALJ to discount the findings of an examining provider.   *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (addressing ALJ's reliance upon non-examining physician's opinion to discount findings of treating physician).[7]

It bears repeating that neither Dr. Thrasher, nor Dr. Pinkston, considered the effects of plaintiff's mental impairments, absent DAA.[8]   The only mental health professional of record who explicitly considered the effects of plaintiff's PTSD, separately from his DAA, was his treating psychologist, Dr. Transier.   While the ALJ acknowledged Dr. Transier's opinion, she found it to be only "partially persuasive," because it did not specify any work-related limitations, and therefore, did not address all of the issues to be evaluated in an SSA disability claim.   (Tr. 25).

In her decision, the ALJ correctly recognized that Dr. Transier did not explicitly quantify the occupational effects of plaintiff's PTSD.   However, Dr. Transier indicated that Cripps's

---

[7]  The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician."   *Villa v. Sullivan*, 895 F.2d 1019,1024 (5th Cir. 1990) (citing *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).

[8]  In his brief, the Commissioner stated that Dr. Thrasher's opinion was premised upon plaintiff's representation that he had been sober for two months.   (Gov't Brief, pg. 13).   If, in fact, Dr. Thrasher's opinion reflected the effects of plaintiff's mental impairments, absent DAA, then that also undermines the rationale for the ALJ's decision.   *See discussion, supra.*

PTSD resulted in "occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood." (Tr. 651). In selecting this level of impairment, Dr. Transier eschewed other options such as 1) the symptoms did not interfere with occupational and social functioning; 2) occupational and social impairment was only mild or transient; 3) occupational and social impairment resulted in only occasional decrease in work efficiency and intermittent inability to perform occupational tasks; 4) occupational and social impairment with reduced reliability and productivity; and 5) total occupational and social impairment. *Id.* Thus, of the options available, only one appeared to be more severe than the characterization selected by Dr. Transier. Moreover, by passing over the other options that included occasional decrease in work efficiency and only intermittent inability to perform tasks, it stands to reason that Transier felt that plaintiff's PTSD caused more frequent impairment. Regardless, Dr. Transier's opinion does not provide support for the ALJ's RFC, absent DAA.

In sum, none of the opinions of the mental health professionals provide support for the ALJ's RFC, absent DAA. *See Brown v. Apfel*, 192 F.3d 492, 499 (5th Cir.1999) ("nowhere in these records do any of [the claimant's] doctors express an opinion as to what [her] condition would be if she ceased abusing drugs or alcohol.").[9] To be sure, as the ALJ recognized, plaintiff appears able to perform activities of daily living, and to tend to household and family matters – when sober. However, according to Cripps, concentration always has been a problem. (Tr. 266-269). Moreover, he feels trapped in work situations and becomes irritated and anxious around people. (Tr. 58). In addition, plaintiff candidly admitted at the hearing that he

---

[9] As with the first four steps of the sequential evaluation process, plaintiff bears the burden of proving that DAA is *not* a contributing factor material to her disability. *Brown, supra*. Nonetheless, the ALJ's findings still must be supported by substantial evidence.

functioned better whilst he was drinking.   (Tr. 53).   In other words, plaintiff's own testimony does not support the ALJ's RFC, absent DAA.

## II.      Step Five and Remand

Because the foundation for the ALJ's step five determination, absent DAA, was premised upon an RFC that is not supported by substantial evidence, the court further finds that the ALJ's finding of materiality of substance abuse disorder and concomitant conclusion that plaintiff was not disabled, likewise is not supported by substantial evidence.

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.   42 U.S.C. §405(g).   When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.   *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).   The instant record is not so disposed.   Plaintiff's residual functional capacity assessment remains indeterminate.

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings

consistent herewith.[10]

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 29th day of June 2020.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

---

[10]   The court need not consider plaintiff's remining assignments of error.   These issues may be addressed upon remand.